■ EDTO FOODS, LTD., Petitioner, v NEW YORK STATE LIQUOR AUTHORITY, Respondent.—Proceeding pursuant to CPLR article 78 to review a determination of the respondent New York State Liquor Authority, dated May 21, 1985, which adopted the findings of an administrative law judge made after a hearing, and imposed a $1,000 bond claim, revoked the on-premises liquor license of the petitioner Edto Foods, Ltd., and directed that no new license be issued for the subject premises for a period of 24 months, beginning May 14, 1985.

Petition granted to the extent that the determination is modified, on the law, by deleting the penalties imposed. As so modified, determination confirmed, without costs or disbursements, proceeding otherwise dismissed on the merits and matter remitted to respondent New York State Liquor Authority for further proceedings consistent herewith.

On or about March 1, 1983, the respondent New York State Liquor Authority (the Authority) issued an on-premises liquor license to the petitioner Edto Foods, Ltd., for premises located at 183 West Main Street, Sayville, New York. Thereafter, the license was renewed annually upon application.

By notice dated July 18, 1984, the Authority instituted a proceeding pursuant to Alcoholic Beverage Control Law § 118 to revoke petitioner's license, upon the following charges:

"1. That on January 26, 1984, February 9, 1984, February 10, 1984 and March 25, 1984 the licensee suffered or permitted the licensed premises to become disorderly by suffering or

permitting the storage, possession, trafficking or sale of a controlled substance on the licensed premises in violation of subdivision 6 of Section 106 of the Alcoholic Beverage Control Law.

"2. That the licensee's conduct by its Vice President and Director, Benjamin Russo, leading to his arrest on or about April 10, 1984 of four counts of the crime of Criminal Sale of a controlled substance in the Third degree, New York Penal Law, Section 220.39, a Class B Felony, was of such improper nature as to warrant revocation, cancellation, or suspension of its license in accordance with Rule 36.1 (n) of the Rules of the State Liquor Authority [9 NYCRR 53.1 (n)]."

The petitioner entered a plea of "not guilty" to the charges and a statutory hearing was held on January 29, 1985, before an administrative law judge.

The only witnesses to testify at the hearing were an undercover police officer and Robert Kerzner, the principal stockholder of petitioner corporation. The undercover officer testified that on the four dates in issue cocaine was purchased on the premises from Benjamin Russo and that on the initial date, January 26, 1984, Russo identified himself as the owner of the premises. The officer further testified that on April 10, 1984, Russo was arrested for criminal sale of a controlled substance in the third degree.

Admitted into evidence was a Suffolk County Police Department Court Disposition Report indicating that on August 22, 1984, Russo pleaded guilty to attempted criminal sale of a controlled substance in the third degree, in full satisfaction of a multicount indictment. The report also indicated that on October 19, 1984, he was sentenced to six months in the County Jail and five years' probation.

Also admitted into evidence were documents showing that at the time in issue, Russo, a vice-president of the petitioner, was a 10% shareholder, owning two of the petitioner's 20 shares. The other 18 shares, or 90%, were then owned by Robert Kerzner, the petitioner's president.

At the administrative hearing, no evidence was proffered by Kerzner to controvert the undercover officer's testimony concerning the on-premises sales of cocaine. Rather, Kerzner's testimony was addressed to his alleged lack of responsibility for Russo's actions and to the severe hardship that the penalty would cause him.

Based upon the record before us we conclude that there is substantial evidence to support the findings of the administra-

tive law judge, which findings were adopted by the Authority, that the petitioner, as charged, "suffered or permitted the licensed premises to become disorderly", etc., and that the petitioner's conduct "by its Vice President and Director, Benjamin Russo * * * was of such improper nature as to warrant * * * suspension of its license in accordance with Rule 36.1 (n) of the Rules of the State Liquor Authority [9 NYCRR 53.1 (n)]".

Further, given the seriousness of the charges and the fact that Russo was a 10% shareholder, vice-president of the petitioner corporation, and manager of the premises, the Authority's determination was appropriate insofar as it imposed a forfeiture of the $1,000 bond and revoked petitioner's license (*see, Matter of 17 Cameron St. Rest. Corp. v New York State Liq. Auth.,* 48 NY2d 509; *Matter of 1650 Hempstead Turnpike Rest. Corp. v New York State Liq. Auth.,* 106 AD2d 447, *lv denied* 64 NY2d 604).

However, we conclude that the Authority's determination prohibiting licensure of the premises for 24 months is so disproportionate to the violations charged, in light of all of the circumstances, as to be shocking to one's sense of fairness (*Matter of Pell v Board of Educ.,* 34 NY2d 222, 233).

At the hearing, Robert Kerzner, the petitioner's principal stockholder at the time in question, testified that he had been in business some 20 years as a general contractor. His work involved commercial and residential home improvement.

Kerzner's son had been interested "in going into the bar business" but had not had sufficient financial backing to accomplish his goal. However, the son was killed in an automobile accident at the age of 23. In his son's memory, Kerzner decided to purchase a bar and, with the proceeds of a $40,000 insurance policy, he purchased a bar at 183 West Main Street, Sayville, New York. Kerzner renamed the bar "Splinter's" which had been his son's nickname.

Kerzner's partner, Edward Cooley, had previous experience in bar management and consequently Cooley became the manager at "Splinter's". Soon thereafter Kerzner began to have "a lot of problems with Mr. Cooley: mismanagement, missing funds, et cetera". Kerzner had no managerial responsibilities and, indeed, did not work on the premises.

In approximately July 1983, Cooley hired Benjamin Russo to be the bartender. Russo subsequently told Kerzner that Cooley was stealing money from the bar. Kerzner eventually bought out his partner's interest for $7,500 and the stealing

stopped. Russo then became a salaried manager and Kerzner gratuitously transferred 10% of his interest in the petitioner to Russo in recognition of "his initiative and the way he was working for [Kerzner], for [his] interests". Russo also became the petitioner's vice-president.

At or about this time, Kerzner decided to sell the premises because he was losing money. According to Kerzner, "I was into the hole at that time for over $100,000" which included the initial $40,000 investment. In addition, he had been borrowing from one of his corporations "to keep the other one going".

The evidence discloses that while Kerzner solved the stealing problem by purchasing Cooley's interest and then replacing Cooley with Russo, his trust was again betrayed when Russo sold controlled substances at the premises on January 26, February 9 and 10, and March 25, 1984. Kerzner had never seen Russo sell controlled substances on the premises. Indeed, the record reveals that on two of the dates in question he was not in the country and on the other two dates he was not at the premises. Kerzner himself had never been arrested and, in fact, came from a family of police officers.

Kerzner testified that the arrest, which apparently did not take place until April 10, 1984, was not publicized. To his knowledge, and from what appears in the record, Russo was not incarcerated after his arrest. Kerzner testified that he was advised of Russo's arrest for the first time in June, 1984 by Russo himself. Russo also told him "that he was set up in the place" by a female high school teacher, that he was not guilty, that he had hired lawyers and he was "going to fight the case". Kerzner demanded Russo's resignation but Russo—who, as previously noted, obtained his 10% interest in the petitioner gratuitously—now demanded that Kerzner pay $1,000 for that interest. Finally, on July 27, 1984, Russo resigned and transferred his interest in the petitioner to Kerzner.

With respect to the impact of the two-year licensing prohibition imposed on the premises by the Authority, it is significant that on March 15, 1984, Kerzner, without knowledge of Russo's unlawful conduct and obviously without knowledge of Russo's arrest, which took place approximately one month later, entered into a contract for the sale of the bar to a third party.

The contract itself was not placed in evidence at the hearing, but was submitted with petitioner's motion for a stay pending determination of this CPLR article 78 proceeding.

The contract discloses that petitioner's lease is for the term of October 15, 1982 to September 15, 1992, and that the sales price is $155,000.

In his motion for a stay pending a determination of this CPLR article 78 proceeding, Kerzner averred that during the remodelling of the premises, he took a second mortgage on his home and borrowed approximately $50,000 from other sources in his own name; that if he is forced to close the premises and also lose the contract of sale of the premises, he and his family would lose their life's savings and he would be personally bankrupt—all of which resulted from his misplaced trust and reliance upon Russo, who had received a 10% interest.

Under the unusual circumstances of this case, we conclude that "the maximum penalty the record will sustain" (*Rob Tess Rest. Corp. v New York State Liq. Auth.,* 49 NY2d 874, 876) is the forfeiture of the $1,000 bond and revocation of petitioner's license (*see, Matter of 17 Cameron St. Rest. Corp. v New York State Liq. Auth., supra; Matter of 1650 Hempstead Turnpike Rest. Corp. v New York State Liq. Auth., supra*), and that the further penalty of a two-year proscription against licensing of the premises is "so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct" (*Matter of Pell v Board of Educ., supra,* p 234). Accordingly this matter is remitted to the respondent New York State Liquor Authority for reconsideration of the appropriate penalty to be imposed, in accordance herewith (*see, Rob Tess Rest. Corp. v New York State Liq. Auth., supra,* p 876). Mollen, P. J., Mangano, O'Connor and Weinstein, JJ., concur.